*Bessie Jean Peete v. Maryland Elizabeth Peete*, No. 2098, September Term 2021. Opinion by Wells, C. J.

**FAMILY LAW — BIGAMY— STANDING TO ANNUL**

Vacating a judgment of divorce leaves the parties to the divorce action still married. If one of the parties remarries, the second marriage is void, because it is bigamous. Further, in this unique circumstance, the aggrieved spouse has standing to seek to annul the second marriage because it is a bigamous union.

**FAMILY LAW — BIGAMY— STANDING TO ANNUL — LACHES**

Even though a party may have standing to annul a bigamous union, the equitable doctrine of laches may apply, particularly when, as here, the allegedly aggrieved party waited at least 13, and plausibly, almost 20 years to challenge her husband's remarriage and did so admittedly not to vindicate her marital rights, but solely for financial gain.

Circuit Court for Prince George's County
Case No. CAD2019363

BESSIE JEAN PEETE

v.

MARYLAND ELIZABETH PEETE

_____

Wells, C.J.,
Arthur,
Harrell, Glenn T., Jr.
    (Senior Judge, Specially Assigned),

JJ.
_____

Opinion by Wells, C.J.
_____

Filed:  March 1, 2023

Pursuant to the Maryland Uniform Electronic Legal Materials
Act (§§ 10-1601 et seq. of the State Government Article) this
document is authentic.



Gregory Hilton, Clerk

\* At the November 8, 2022, general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Special Appeals of Maryland to the Appellate Court of Maryland.  The name change took effect on December 14, 2022.

Bessie and Author Peete were married in 1971. They later divorced, at which time Author married Maryland.[1] After Author's death many years later, Bessie had the divorce judgment declared void, and then filed a complaint in the Circuit Court for Prince George's County to annul Author's second marriage. The circuit court dismissed Bessie's complaint on grounds that she lacked standing. Bessie timely appealed, raising the following two issues, which we have rephrased for clarity[2]:

I.      Did the circuit court err in holding that Bessie lacked standing to bring a complaint to annul Author's second marriage to Maryland?

II.     Does laches bar Bessie's complaint for an annulment?

We hold that Bessie had standing to bring a complaint for annulment, but we conclude, under the unique circumstances of this case, that laches bars her complaint. Accordingly, we shall affirm the judgment of the circuit court on alternative grounds, consistent with this opinion.

---

[1] Because the three people involved here, Author, Bessie, and Maryland, have the same last name, for ease of understanding we shall refer to them by their first names. We mean no disrespect by using the parties' first names.

[2] Bessie had stated her appellate issues as follows:

1.      Did the Circuit Court err in deciding that improper notice of divorce proceedings, and subsequent revocation of the DC Superior Court divorce decree was insufficient to create a bigamous relationship which would require the Circuit Court to overturn (find void) the marriage between A[u]th[o]r Peete and Maryland Peete?

2.      Is 21 years too late to correct an error regarding bigamous marriage?

## BACKGROUND

On January 18, 1971, Bessie and Author were married in Washington, D.C. but separated in the spring of 1975. Roughly 15 years after they separated, on April 9, 1991, Author filed a complaint for absolute divorce in the Superior Court for the District of Columbia. Bessie did not file an answer, nor did she appear at the subsequent divorce hearing, during which the court took testimony from Author and the parties' son. Finding that the parties had lived apart since the spring of 1975 without cohabitation, the court granted Author a default judgment of absolute divorce from Bessie.

On June 13, 1992, several months after Author obtained the judgment for divorce, he married Maryland in Prince George's County, Maryland. The two remained married until Author's death about 15 years later, on September 9, 2007. Upon his death, the Orphans' Court for Prince George's County appointed Maryland executor of Author's estate.

On November 18, 2011, roughly twenty years after the 1991 judgment for divorce and four years after Author's death, Bessie filed a motion in the Superior Court for the District of Columbia to vacate the judgment of divorce based on improper and ineffective service of process. Author was designated the plaintiff; Bessie the defendant; Maryland, as executor of Author's estate, was served with a copy of the motion. Bessie alleged she had not received the complaint for absolute divorce. She believed she was still married to Author and claimed to have had marital relations with him up to the time of his death. Bessie argued that service was ineffective because the person who signed the certificate of

service, Cynthia Williams, was a minor in 1975 and did not reside in her home, as required by the D.C. Superior Court Rules governing service.

A hearing followed on July 19, 2012. The court admitted into evidence an affidavit of proof of service that was filed on April 12, 1991, attesting that Bessie had been served with the divorce complaint by certified mail on April 10, 1991. The affidavit was accompanied by a "green card" signed by Williams, attesting that she was Bessie's roommate and she had accepted the certified mail containing the complaint and summons. Williams testified that when she accepted the certified mail and signed the accompanying affidavit, she was 16 years old, dating Bessie's son, and living in New Jersey. Williams testified that she lived with Bessie two or three years later when she married Bessie's son. Williams further testified that it was possible she gave the certified mail to Bessie after signing for it, but she did not remember doing so. Bessie testified that Williams never lived with her.

Because the D.C. Superior Court Domestic Relations Rule governing service requires a third person signatory to reside with the recipient and finding that Williams did not reside with Bessie at the time of the service, the court ruled that service was defective and the divorce judgment void. On July 30, 2013, the D.C. Superior Court issued a written order vacating the judgment for divorce.[3]

---

[3] In its written order, the D.C. Superior Court stated that it was making no findings or conclusions regarding the validity of Author's subsequent marriage to Maryland because that question was not before the court. Although the court noted that "a void judgment cannot acquire validity because of laches[,]" the court stated that if laches were to apply it would "almost certainly provide a valid defense to this Judgment." The court believed that

(Continued)

Roughly nine years later, on December 7, 2020, Bessie filed a complaint in the Circuit Court for Prince George's County seeking to annul the marriage between Author and Maryland on grounds of bigamy, in other words, that Author was still legally married to Bessie when he married Maryland. Bessie admitted that the purpose of her action was to obtain a share of Author's pension. Following a hearing, a magistrate issued a report and recommendation, concluding that Bessie did not have standing to annul the marriage between Author and Maryland. On August 9, 2021, Bessie filed exceptions. Following two exceptions hearings, the circuit court issued a memorandum and order holding that the magistrate's findings and conclusions were not clearly erroneous. The court then overruled Bessie's exceptions and entered judgment for Maryland. Bessie has filed this timely appeal.

## DISCUSSION

In this appeal Bessie advances two arguments.[4] First, she argues that contrary to the circuit court's holding, she has standing to annul the marriage between Author and Maryland because a bigamous marriage is void, not voidable. Next, she argues that, because Author's bigamous marriage to Maryland was void, not voidable, the circuit court

---

Bessie's claim that she was not aware of the divorce was "wholly" not credible based on the credible testimony of Author's children; the listing of Maryland as the surviving spouse in the probate proceedings by Author's children; Bessie's actions following the divorce; and evidence that Bessie and Maryland had interactions related to Author's children from his first marriage during his second marriage. The court also did not find credible Bessie's uncorroborated claim that she and Author continued to have sexual relations after the date of their divorce.

[4] Maryland has not filed an appellate brief.

4

erred in suggesting that the almost 21-year delay between the 1991 judgment for divorce and her 2011 filing to vacate that judgment would bar her annulment action.

## I.  Standing to Annul

### Standard of Review

A court of equity has jurisdiction in an action for annulment of a marriage or divorce.  Md. Code Ann., Family Law Art ("FL") § 1-201(b)(3), (4). "We review a circuit court's determination of standing for clear error." *Moulden v. State*, 212 Md. App. 331, 344 (2013) (citing *Joyner v. State*, 87 Md. App. 444, 451 (1991) ("The circuit court's ruling on the standing issue is subject to the clearly erroneous standard of review.")).

### The Circuit Court's Ruling

The circuit court's memorandum and order began with citation to three Maryland statutes regarding marriage. FL § 2-201(b), provides that "[o]nly a marriage between two individuals who are not otherwise prohibited from marrying is valid in this State." Criminal Law § 10-502(b) provides that a person may not marry another while lawfully married to a living person. FL § 2-202 provides that certain types of marriages are void in Maryland and then lists various prohibited degrees of affinity and consanguinity. Bigamy is not mentioned.

Given this statutory law, the circuit court reasoned that at the time Author married Maryland there was no legal prohibition to the marriage. Author and Maryland were not within any degree of lineal or collateral consanguinity; they both consented to the marriage; there was no evidence of fraud; and Author possessed a valid divorce decree. Placing great weight on the cited Maryland statutes and finding that at the time Author married Maryland

5

he possessed a valid divorce decree, the circuit court reasoned that the marriage between Author and Maryland was voidable.

The court then analyzed Maryland case law. The court noted that Maryland courts recognize a distinction between "voidable" and "void" marriages, and notwithstanding the court's conclusion to the contrary, noted that Maryland courts hold that "bigamous and incestuous marriages are void marriages[] because they are invalid regardless of the parties' consent." *Morris v. Goodwin*, 230 Md. App. 395, 404 (2016), *cert. dismissed*, 451 Md. 587 (2017) (citations omitted). *See Ledvinka v. Ledvinka*, 154 Md. App. 420, 434 (2003) (a party is not competent to enter into a new marriage when already married to someone else and that marriage is not terminated by annulment, death, or absolute divorce. "It is the lack of capacity to enter into the new marriage that renders the [new] marriage void *ab initio*.") (Citation omitted)). The court then described the resulting effect of a voidable and void marriage. When a marriage is voidable, only a party to the marriage may seek an annulment of the marriage and may only do so during the life of the parties. *See Morris*, 230 Md. App. at 406-409. When a marriage is void, a third party may seek an annulment to the marriage at any time. *Ledvinka*, 154 Md. App. at 434. Because the court found the marriage voidable and not void, the court reasoned that Bessie had no standing to invalidate Author's and Maryland's marriage as Bessie was not a party to the marriage and Author was dead.

6

**Analysis**

Our concern with the circuit court's opinion is that the court looked only to Maryland statutory law in its determination that a bigamous marriage is voidable instead of void. While we agree that Maryland statutory law is perhaps unclear on this point, Maryland's appellate authority (as well as case law from our sister jurisdictions) is clear that a bigamous marriage is void, not voidable.[5] *See Morris*, 230 Md. App. at 404 ("[B]igamous and incestuous marriages are void marriages, because they are invalid regardless of the parties' consent."); *Townsend v. Morgan*, 192 Md. 168, 173 (1949) ("A second marriage contracted while a first marriage exists undissolved is a nullity without the passage of any judicial decree declaring it void.").

*Morris* is instructive. In *Morris*, the personal representative (and mother) of the deceased filed a complaint to annul her daughter's marriage based on fraud. The circuit court dismissed the complaint for lack of standing. On appeal, we affirmed.

---

[5] *Gibbons v. Blair*, 376 N.W.2d 22 (N.D. 1985) is representative of the rulings in our sister jurisdictions.

> The majority rule is soundly based on the public policy that regards the marriage contract as so uniquely personal that any action to annul or dissolve it cannot be commenced after the death of either of the parties to the marriage unless the validity of the marriage is challenged on a ground that made the marriage absolutely void rather than voidable. Applying the majority rule and rationale to the facts of this case, we hold that an action to annul a marriage on the ground of fraud can only be brought by the defrauded spouse while both parties to the marriage are living.

*Gibbons*, 376 N.W.2d at 25.

Although *Morris* concerned an action for annulment based on a fraudulent marriage, not a bigamous marriage, the framework we used in *Morris* guides us in this case. In *Morris*, we recognized that in determining whether a marriage is void or voidable, we look to "'whether, with proper consent, the parties could have established a valid marriage. If not, the marriage is considered void.'" *Morris*, 230 Md. App. at 404 (quoting Cecily Fuhr, *Cause of Action to Annul Marriage*, in 65 CAUSES OF ACTION ("COA") 2d 617 § 3, p. 638). We stated that "'[i]f, on the other hand, the parties could have lawfully married had one or the other party's consent to the marriage not been legally ineffective, the marriage is voidable rather than void.'" *Id.* (quoting Fuhr, 65 COA 2d 617 § 3, p. 638). We then reasoned that "bigamous and incestuous marriages are void marriages, because they are invalid regardless of the parties' consent." *Id.* (citation omitted). In contrast, "a marriage procured by duress or exertion of undue influence is voidable, because the defect in the marriage goes to a party's consent." *Id.* (quotation marks and citation omitted). We noted the distinct effect of void and voidable marriages, stating that "voidable marriages may be annulled only during the joint lives of the parties to the marriage." *Id.* at 408. In an accompanying footnote, we stated:

> Conversely, courts have ruled that void marriages may be challenged by third parties after the death of one of the married parties. *See In re Estate of Davis*, 55 Or. App. 982, 640 P.2d 692, 693 (1982) ("A void marriage, on the other hand, is invalid from the outset and may be challenged by third parties."); *Abel v. Waters*, 373 So.2d 1125, 1128 (Ala. Civ. App. 1979) ("Clearly, the contention is that this was an invalid marriage, void *ab initio.* It is therefore clear to this court that in this instance, on the grounds alleged by the personal representative, an annulment action can be maintained after the death of one of the parties.").

*Id.* at 408 n.4.

Here, in 2012, the D.C. Superior Court ruled that Author's 1991 judgment of divorce was void and as a result the court vacated the divorce decree. The effect was to create a bigamous marriage between Author and Maryland. A bigamous marriage is void because there is no way to "fix it." *See Ledvinka*, 154 Md. App. at 436. Therefore, contrary to the court's ruling, Bessie has standing in this unique situation to annul the bigamous marriage because that marriage directly affected her marriage to Author.

## II. Laches

Bessie next argues that the circuit court erred in considering the effect the nearly 21-year delay had on her motion to annul Author's second marriage. She cites no case law to support her argument, nor does she set forth any further reasoning or argument to explain it. Essentially, she flatly states that the doctrines of laches or equitable estoppel do not apply in this case. Although we agree that generally the application of laches will not bar a suit to set aside a bigamous marriage, under the unique circumstances presented here, laches or equitable estoppel is applicable.

We have found only one Maryland case, *Townsend*, previously cited, that discusses application of equity in the context of a bigamous marriage. In *Townsend*, a husband brought suit to annul his marriage to his second wife and to sell their jointly owned property. *Id*. at 172. He alleged that he married his first wife in 1930, and within a few months, they separated, and she left the State of Maryland. *Id*. Ten years later, he married his second wife. *Id*. Because he had not heard from his first wife since she left Maryland, the husband believed that he was free to marry again. *Id*. Several years after his second

9

marriage, he obtained a divorce from his first wife, after which he and his second wife separated and he filed for an annulment. *Id*. at 173. His second wife answered by asserting that the complaint was barred in equity by the doctrine of "unclean hands." The Court of Appeals, now called the Supreme Court of Maryland,[6] began its analysis by stating:

> Common-law marriages are not valid in Maryland, and therefore when a party who has a spouse living marries another, cohabitation under the second marriage after the death or divorce of the first spouse does not give validity to the second marriage. *Mitchell v. Frederick*, 166 Md. 42, 46 [(1934)]. A second marriage contracted while a first marriage exists undissolved is a nullity without the passage of any judicial decree declaring it void.

> \* \* \*

> It is generally accepted that the equitable maxim that he who comes into equity must come with clean hands cannot be applied in any case where the result of the application sustains a relation which is denounced by statute or is contrary to public policy. *Heflinger v. Heflinger*, 136 Va. 289, 118 S.E. 316 [(1923)]; *Simmons v. Simmons*, 57 App.D.C. 216, 19 F.2d 690 [(1927)]. In proceedings to annul a bigamous marriage, the interest of the State is paramount to the grievances of the parties directly interested. The State sponsors the sanctity of the marriage relation and the welfare of society. In some cases the interests of unborn children may be affected. There is a difference between the ordinary case where the court refuses to aid the complainant in securing benefits from his own wrongdoing and the case where the complainant desires to have a judicial declaration that a marriage is null and void. When a party files a suit for annulment of his marriage, he is deemed as coming into court repenting of his wrongdoing and asking the court to correct his wrongful act as far as possible, in order to prevent any injurious consequences which might be cast thereby in the future upon innocent persons and upon the State. For these reasons the clean hands

---

[6] At the November 8, 2022 general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Appeals of Maryland to the Supreme Court of Maryland. The name change took effect on December 14, 2022. *See*, *also*, Md. Rule 1-101.1(a) ("From and after December 14, 2022, any reference in these Rules or, in any proceedings before any court of the Maryland Judiciary, any reference in any statute, ordinance, or regulation applicable in Maryland to the Court of Appeals of Maryland shall be deemed to refer to the Supreme Court of Maryland…."). The Judges of the Court are now called "Justices."

10

doctrine is not applicable in a suit to annul a bigamous marriage. The marriage status being on a different footing from contracts generally, a party may be relieved from a void marriage, although fully aware of its invalidity when contracted. Phelps, Juridical Equity, sec. 259; 1 Bishop, Marriage, Divorce and Separation, sec. 722; *Davis v. Green*, 91 N.J.Eq. 17, 108 A. 772 [(1919)]; *Arado v. Arado*, 281 Ill. 123, 117 N.E. 816 [(1917)]; *Kiessenbeck v. Kiessenbeck*, 145 Or. 82, 26 P.2d 58, 60 [(1933)].

It is an unquestioned principle that a court of equity will refuse aid to a complainant who has acted fraudulently or gained an advantage by deceit or unfair means. But general iniquitous conduct, unconnected with the transaction alleged as the cause of action, does not deprive him of his right to relief in a court of equity. Equity does not demand that suitors shall have led blameless lives. The maxim requiring clean hands does not disqualify one who has not dealt unjustly in the particular matter in which judicial protection or redress is sought. <u>The courts apply the maxim only where some unjust act of the complainant affects the equitable relations of the parties with respect to the matter presented for adjudication</u>. Thus the maxim is applied, not by way of punishment for past violations of the law, but upon considerations that make for justice. *Trice v. Comstock*, 8 Cir., 121 F. 620 [(1903)]; *Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 54 S.Ct. 146, 148 [(1933)].

*Townsend*, 192 Md. at 173, 175-76 (emphasis added). Because the Court believed that considerations of justice did not warrant application of the doctrine of unclean hands to bar husband from obtaining a decree for the sale of the parties' jointly owned property, the Court reversed the chancellor's decree dismissing the complaint, and remanded the case to the circuit court for further proceedings. *Id*. at 178. We observe that the Court's holding was based on principles of equity in the context of "general iniquitous conduct" and would not necessarily apply where the unjust act "affects the equitable relations" between the parties.

Very helpful to us are cases from other jurisdictions where courts have applied estoppel or laches to bar the suit when presented with a similar (and rare) fact pattern as

11

the one presented here – where a first wife sought to invalidate a second marriage several years after the death of the husband in order to reap a financial windfall. *See Self v. Self*, 893 S.W.2d 775 (Ark. 1995) (in a suit over entitlement to widow's benefits from the Veterans Administration – first wife's motion to set aside allegedly invalid divorce decree 24 years after it was entered was barred by laches)[7]; *Estate of Butler*, 444 So.2d 477 (Fla. Dist. Ct. App. 1984), *cert. denied*, 451 So.2d 847 (Fla. 1984) (first wife estopped from claiming benefits of that marriage when she married a second man five years after she married her first husband; her first husband died 25-years later; and she waited six years after her first husband's death to assert any rights to his estate); and *Morehouse v. Morehouse*, 111 S.W.2d 831 (Tex. App. 1937) (in first wife's suit against administrator of deceased husband, her motion to set aside allegedly invalid divorce decree is barred by equitable estoppel where she waited 13 years after it was entered). *See also* Annotation, Estoppel or Laches Precluding Lawful Spouse From Asserting Rights in Decedent's Estates as Against Putative Spouse, 81 A.L.R. 3d 110, §§10A-16A (1977, 2022 Supp.) (listing cases that have applied laches or estoppel to bar suit under similar fact patterns).

In making a laches determination, a court shall look to the reasonableness of the delay and whether the delay prejudiced the opposing party. *Jones v. State*, 445 Md. 324, 349-50 (2015) (citations omitted). Here, the record is unclear when Bessie learned that

---

[7] *But see Raymond v. Raymond*, 36 S.W.3d 733, 737-38 (Ark. 2001) where the Supreme Court of Arkansas distinguished *Self* by reasoning that the divorce decree there was merely voidable, but in *Raymond*, the decree was void from inception where wife was not properly served. The Court determined that laches did not apply to bar former wife from petitioning to set aside divorce decree that was void.

12

Author had remarried - whether it was around the time he obtained the 1991 divorce judgment, when he remarried in 1992, or, as she claimed, when he died in 2007. In any event, by her own account, she waited at least 13 years after Author's death before asserting any interest in his estate in 2020.

We conclude that the unusual set of facts before us necessitates the application of laches. This is particularly so where Bessie's annulment suit was admittedly motivated only to gain financial rights, not to vindicate the status of the marriage. Additionally, because we have applied laches under similar circumstances, specifically where the petitioning party alleged fraud instead of bigamy, we conclude that to not apply laches in this case would work a grave injustice. *Cf. Pryor v. Pryor*, 240 Md. 224, 230-32 (1965) (Supreme Court of Maryland upheld a circuit court's application of laches to bar first wife's petition to vacate divorce decree on grounds of fraud, because she was not served with the divorce petition and neither she nor her husband resided in Maryland, when first wife waited 13 years before filing petition to vacate, husband remarried immediately upon filing of the divorce decree, and he died prior to first wife filing her petition to vacate.).

An appellate court may issue a remand for further proceedings instead of entering a final order affirming, reversing, or modifying a judgment when the interests of justice and judicial expediency require. Md. Rule 8–604(d). *See also Southern v. State*, 371 Md. 93, 103 (2002). But we exercise our discretion and decline to do so in this instance when the record before us is clear and undisputed. The record demonstrates that Bessie waited a minimum of 13 years after Author's death before filing the annulment action. She states in her appellate brief that eight of those 13 years, between 2012 (when the court vacated the

13

divorce decree) and 2020 (when she filed her annulment action), were due to her "health, and COVID[.]" She does not elaborate beyond that statement. Although she offers no further elaboration, we conclude that Bessie's 13-year delay in asserting her marital rights was unreasonable and unfairly prejudices Maryland (and Author). Accordingly, under the circumstances before us, we conclude that Bessie's action to annul the marriage between Author and Maryland is barred by laches.

**JUDGMENT AFFIRMED ON GROUNDS CONSISTENT WITH THIS OPINION. APPELLANT TO PAY THE COSTS.**

14